ROBERT N. HUNTER, JR., Judge.
 

 *282
 
 Justin Duane Hurd ("Defendant") appeals following a jury verdict convicting him of three counts of first degree murder, two counts of first degree kidnapping, and one count of first degree arson. Following the verdict, the trial court imposed three consecutive life sentences without parole. On appeal, Defendant asks this Court to vacate his convictions and remand for a new trial, and contends (1) the trial court clearly erred in sustaining the State's
 
 Batson
 
 challenge, (2) the State's closing argument was grossly improper and the trial court should have intervened
 
 ex mero motu,
 
 and (3) the State's closing argument violated Due Process. We disagree.
 

 I. Factual and Procedural Background
 

 On 20 April 2009, a Mecklenburg County grand jury indicted Defendant for three counts of first degree murder, two counts of first degree kidnapping, and one count of first degree arson. On 18 June 2009, the case was declared capital and Defendant pled not guilty. The case was called for trial 21 January 2014. The State presented a circumstantial case using thirty-three witnesses and over 268 exhibits. None of the State's witnesses were eyewitnesses to the murders. Two of the witnesses testified they met Defendant in jail and heard him claim responsibility for the murders. On appeal, Defendant does not contest the veracity of the State's evidence. The following is a summary of the evidence taken in the light most favorable to the State.
 

 In January 2008, Antonio Harmon ("Harmon"), Nathaniel Sanders ("Sanders"), and two other men traveled from Cincinnati, Ohio to meet with Defendant in Atlanta, Georgia. During the meeting, Sanders talked to Defendant for twenty minutes. Harmon had seen Defendant once or twice in Cincinnati, but never talked to him. While Defendant and Sanders spoke, Harmon looked inside Defendant's car and saw a duffel bag of guns inside.
 

 On 1 February 2008, Defendant called Sanders to meet again. Defendant, Sanders, Harmon, and the two other men met at a bar. During this meeting Defendant and Sanders spoke, and Harmon saw a duffel bag containing a Taser inside Sanders's van.
 

 After the meeting, Sanders put the duffel bag of guns inside his van, and told Harmon they could "go out of town and bust a couple of moves"
 

 *283
 
 "to get some extra cash." Harmon declined because he "didn't want to get caught up in anything," and decided to go home to Cincinnati.
 

 On 3 February 2008, Kevin Young lived in a house located in Charlotte, North Carolina, with his girlfriend Kinshasa Wagstaff and her nineteen-year-old niece, Jasmine Hines.
 

 *531
 
 Young trafficked marijuana and worked as a disc jockey and handyman, and Wagstaff worked in real estate. Young owed "big money" to "some drug dealers" in New York.
 

 During the evening of 3 February 2008, Defendant acted as an "enforcer" for the New York drug dealers and went to Young's house with Sanders. Defendant killed Young, Wagstaff, and Hines inside the home, and made Sanders "pull the trigger ... so [he too] would be accountable." They burned the house down and put evidence inside a Cadillac Escalade parked inside the garage. The garage door was "kind of pushed out and crumpled up" such that Defendant and Sanders could not drive the Escalade away. The Escalade contained gasoline cans, lighters, trash bags, tennis shoes with Wagstaff's blood on them, and a trash bag containing gasoline, raw chicken parts, a bent knife with a broken tip and Young's blood on it, a Taser, beer bottle, and water bottles.
 

 Investigators found Wagstaff's charred body lying in the front foyer of the house, with her dog's burned body lying next to her. They found various items nearby including a bloody scarf, bloody bed sheet, cell phone, purse, keys, and mail. A medical examination revealed she had multiple stab wounds to the neck, amid "a number of trauma injuries." Her left wrist was bound with double stranded copper wire, and both of her wrists sustained "fire fractures" from being exposed to heat.
 

 In the kitchen, police found Young's charred body next to a spent .45 caliber shell casing. His hands were handcuffed behind his back. He sustained a lethal gunshot wound to the abdomen and "two sharp force injuries" to the neck and cheek.
 

 Hines's body was found uncharred. She had a gag in her mouth formed out of "an orange dish towel that had a scarf [and duct tape] wrapped around it." Hines had two gunshot wounds to her head and back, "some blunt force injuries," bruises, scrapes, and chemical burns to her back, legs, and arms.
 

 At 4:59 a.m., Sanders drove to a nearby Run Exxon gas station between Huntersville and Charlotte. He went into the store and bought coffee and gas cans. The store clerk, Rodchester Hutchins, noticed Sanders had "a busted lip" and a red substance on his hoodie that looked like blood. Sanders appeared "nervous" and said he was "tired." Hutchins
 
 *284
 
 told Sanders to pull his van behind the gas station to rest, but Sanders declined because "he had to get back to Atlanta." He was murdered in Cincinnati six months later.
 

 Defendant was arrested in May 2009 and indicted for the 3 February 2008 triple murder. When he was incarcerated awaiting trial, he told two inmates that Sanders "was taken care of," and he did not have to worry about any witnesses. Defendant was never charged with Sanders's murder.
 

 On 18 June 2009, the case was declared capital. Sometime
 
 [1]
 
 prior to trial, defense counsel filed a pretrial motion entitled, "Motion to Prohibit District Attorney From Peremptorily Challenging Prospective Black Jurors." In it, Defendant requested the trial court "prohibit the District Attorney from exercising peremptory challenges as to potential Black jurors, or in the alternative to order that the District Attorney state reasons on the record for peremptory challenges of such jurors." The trial court noted the motion was "not supported by any showing of a discriminatory practice or intent on behalf of the State," and denied the motion.
 

 The case was called for trial 21 January 2014. On the eighth day of jury selection, 3 February 2014, prospective Juror 10 was called to the jury box. Juror 10 is a fifty-year-old white male who works for the U.S. Postal Service. During
 
 voir dire,
 
 Juror 10 said he could follow the law and be fair and impartial. He described his "feelings about the death penalty" as follows:
 

 Personally, I don't-I don't like the fact that someone's life [is] being taken, but at the same time if that justice is-word that correctly. I think that's what we need to be done, I would think I could go through-I mean, I think I can make a
 
 *532
 
 decision on that.... I would guess I would say before I came here I have no problem. Now that I'm here, I'm actually thinking about it makes you stop and think. I would like to think based on the facts I could make a decision.
 

 He said he did not have strong feelings "for" or "against" the death penalty, and he could give "fair and equal consideration to both the death penalty" and "life in prison without the possibility of parole." He was asked to rate himself on a scale of one to seven, one being "the type
 
 *285
 
 of person who always gives [a life sentence] regardless of the circumstances if someone is convicted of first-degree murder," and seven being "the kind of person who always will give the death penalty." Juror 10 rated himself "[p]robably about a four." He elaborated as follows:
 

 "Well, having not heard facts ... I think ... there's a punishment for a crime. If the facts show that that's what it would call for, I believe I could do that. However, I'm not on one spectrum either." The other jurors rated themselves a "four, five," a "three and a half," a "three and a half to a four," and "right down the middle."
 

 Juror 8 is a thirty-eight year-old woman who identifies as "Asian/Black." She served in the Army and is employed as an EMS dispatcher. Her husband is self-employed and works as a process server and bail bondsman. Her sixteen-year-old step-son is in jail facing charges for second degree attempted assault and sexual battery. Juror 8 stated she and her husband could have bailed her stepson out of jail but chose not to. She explained, "as much as I want to protect my children, I have to protect the community.... [u]ntil I know that it's a safe environment for both him and the community, he'll stay in there." "[If] he did it and the DA can prove that he did it, then yes, he does need to be punished for what he did and he needs to get the help that he needs." She stated she did not hold it against the State that they were prosecuting her stepson, that she was able to "separate" that matter from the murder trial, and she could be fair and impartial to both parties. When asked about the death penalty scale of one to seven, she rated herself a four. She also helped her biological son write a paper for his high school project in December 2013, entitled "Abolishment of the Death Penalty." The paper discussed statistics, states' adoption of the death penalty, and when the last execution occurred in death penalty states.
 

 Outside the presence of the jury pool, defense counsel attempted to strike prospective Jurors 1, 5, 6, and 10. The State raised a
 
 Batson
 
 challenge based on gender and race. The State argued as follows:
 

 By the State's count of the jurors that have been passed during both rounds to the defense, the defense has had the opportunity to peremptory strikes [sic] on 13 total white jurors. Of those 13, they have stricken 10 of them. The math comes out to 76.9 percent of all white jurors that the defense has had an opportunity to use peremptory challenges on have been struck.... As far as the females go, by the State's count, the defense has had the opportunity
 
 *286
 
 to use peremptories on nine female jurors. It has stricken six of those.
 

 The trial court referred to its notes and calculated the defense accepted two of seven while males, zero of six white females, three of three black males, and two of three black females.
 

 Defense counsel and the trial court discussed the issue as follows:
 

 [DEFENSE COUNSEL]: I can give you a race-neutral reason for the last four.... [Juror 10 was] struck because he stated that the punishment should fit the crime, and we felt that he was in favor of capital punishment as a matter of disposition as opposed to analytical comprehension of the law.
 

 [THE COURT]: But I think he also described himself as being on your scale of one to seven about a four.
 

 [DEFENSE COUNSEL]: Yeah, but I don't think we have to accept what [Juror 10] says using his other answers in context.
 

 [THE COURT]: Well, I think you have to take the totality of what he's saying.
 

 The trial court recessed briefly and returned giving "a summary explanation of the
 
 *533
 
 Court's conclusions." The trial court summarized as follows:
 

 [T]he State has shown a prima facie [case] for what I would call its reverse
 
 Batson
 
 claim. The defendant has offered explanations for the strikes as to the four jurors in question. The Court concludes that those explanations as to [Jurors 1, 5, and 6] are not pretextual. The Court does conclude with respect to [Juror 10], that the explanation is pretextual.... the Court perceives from listening to the voir dire that, particularly Juror [8], was much worse. The Court having previously practiced law and the Court did considerable amount of criminal defense work, particularly capital defense, and tried a number of cases trying to elicit opinions of jurors as to what they thought about the death penalty. From that experience, the Court perceived that Juror [8] was much worse on the death penalty than Juror [10], and so doesn't find the explanation that was because of the death penalty was particularly credible.
 

 *287
 
 Thereafter, the prospective jurors were brought back into the courtroom. Jurors 1, 5, and 6 were excused through defense counsel's peremptory challenge, and Juror 10 was kept on the jury panel.
 

 The trial court issued a written order on 18 February 2014 that stated the following,
 
 inter alia:
 

 15. Of the peremptory challenges used by the defense, 10 out of 11 were exercised against white and Hispanic jurors. Over 90% of the defense's peremptory challenges were exercised against white and Hispanic jurors.
 

 16. The sole African American juror challenged peremptorily by the defense was currently employed by the State of North Carolina as a probation officer.
 

 17. When the defense indicated its intention to peremptorily challenge 4 of the 5 prospective white jurors in this group of eight jurors, the State objected on the ground that the defense was excusing jurors on impermissible racial and sexual grounds.
 

 18. A claim that a peremptory challenge is improperly based upon race triggers a three-step inquiry.
 
 State v. Waring,
 

 364 N.C. 443
 
 , 474,
 
 701 S.E.2d 615
 
 (2010).
 

 19.
 
 Batson
 
 has been expanded to prohibit not only the State, but also criminal defendants, from engaging in purposeful racial discrimination in their exercise of peremptory challenges.
 
 State v. Cofield,
 

 129 N.C.App. 268
 
 ,
 
 498 S.E.2d 823
 
 (1998)....
 

 27. The defendant in this case is an African American male.
 

 28. The alleged victims in these cases are all African Americans. Two of the three alleged victims were female
 

 ....
 

 35. The defense filed a pre-trial motion entitled "Motion to Prohibit District Attorney From Peremptorily Challenging Prospective Black Jurors." This motion requested the Court "to prohibit the District Attorney from exercising peremptory challenges as to potential Black jurors, or in the alternative, to order that the District Attorney state reasons on the record for peremptory challenges of such jurors.["] This request was not supported by any showing
 
 *288
 
 of a discriminatory practice or intent on behalf of the State
 

 ....
 

 51. If a prima facie showing of discrimination is established, the burden shifts to the opposing party to articulate a race neutral explanation for its exercise of peremptory challenges.
 
 State v. Maness,
 

 363 N.C. 261
 
 , 272,
 
 677 S.E.2d 796
 
 (2009)....
 

 54. The defense offered its race-neutral explanations for its exercise of these peremptory challenges....
 

 69. At the time that the defense announced its intention to peremptorily challenge [Juror 10], the defense accepted [Juror 8] as a juror. [Juror 8] is an African American female....
 

 84. As a former trial lawyer, who represented defendants in capital cases, the Court interpreted [Juror 10's] language and demeanor as an indication that he would be reluctant to actually return a death sentence. The [C]ourt observed no reluctance on the part of [Juror 8] to make difficult decisions, including the decision to leave her stepson in jail even though her
 
 *534
 
 husband was a bail bondsman who could have posted the bond....
 

 89. A comparison of [Juror 8's] and [Juror 10's] responses concerning the death penalty reveal that at a minimum their views were strikingly similar.
 

 90. In this case, the defendant's race, the victims' race, the repeated use of peremptory challenges against white jurors such that it tended to establish a pattern of strikes against whites in the venire, the use of a disproportionate number of peremptory challenges to strike white jurors and the defense's acceptance rate of white jurors indicate that the defense has exercised challenges against white jurors in a discriminatory manner.
 

 91. The Court concludes based on a totality of the circumstances that [Juror 10's] race was a significant and motivating factor in the decision to exercise a peremptory challenge against him....
 

 *289
 
 96. In this instance, [Juror 10] was not advised that the defense attempted to exercise a peremptory challenge against him....
 

 [T]he Court sustains the State's objection to the defense's attempt to exercise a peremptory challenge against [Juror 10] on the ground that [Juror 10's] race was a significant and motivating factor in the attempt to exercise a peremptory challenge to excuse him from further jury service in violation of the rule created in
 
 Batson
 
 .
 

 Trial proceeded and the State called numerous witnesses. The State rested on 26 February 2014 and asked the trial court to take judicial notice that Sanders died. The court granted the request and stated the following for the jury:
 

 [THE COURT]: [T]he Court at this point is going to take judicial notice of three items. First, that Nathaniel Sanders, also known as Nate Sanders and Lil Nate died on September 28th, 200[8]. Second, that he died in Cincinnati, Ohio.... and that someone other than the Defendant has been indicted for the murder of Nathaniel Sanders in Ohio.
 

 Afterwards, Defendant did not present any evidence. The parties gave their closing arguments and the State argued the following:
 

 [THE STATE]: The last thing ... I want to talk to you about that the Defendant told [the two inmates that testified that the] witness that actually could put him in Charlotte, he's dead and he had him killed.... [And] judicial notice [ ] was taken by [ ] the Court gave you before [sic] we started closing argument was that Nathaniel Sanders was killed, I believe the judge said September 28th, 2008.... And that someone other than the Defendant was charged with that murder. Well, the Defendant never said he killed the eyewitness, he said he had him killed. Here's another interesting thing about the death of Nathaniel Sanders.... Detective Rainwater went and interviewed [Defendant's] girlfriend on September 23rd and asked her where [Defendant] was, showed her a photograph [of Nathaniel Sanders] ...
 

 [DEFENSE COUNSEL]: Objection, your Honor. There's no evidence in the record.
 

 [THE COURT]: Overruled.
 

 *290
 
 In addition to its oral argument, the State used slides that posed the following questions:
 

 • Defense on cross with [police detective] intimated [Defendant] and [Kevin Young] could be friends
 

 • If they were friends then where are the witnesses or other evidence to substantiate that?
 

 • Defense on cross with [police detective] intimated [Defendant] could have been in [Kevin Young's] home on an earlier occasion.
 

 • If he had been in the house, then where are the witnesses or other evidence to substantiate that?
 

 • Defense wants you to believe that [Defendant] drove the [Toyota] Camry
 
 [2]
 
 on an earlier occasion.
 

 *535
 
 • If he drove the [Toyota] Camry on an earlier occasion, then where are the witnesses or other evidence to substantiate that?
 

 • If there was some good reason to analyze the inside of the black garbage bag.
 

 • Why didn't they have it analyzed?
 

 • Where is their DNA analyst?
 

 After closing arguments, the jury began deliberation. The jury returned unanimous guilty verdicts on all charges. The jury recommended a sentence of life without parole for each murder. The trial court imposed three consecutive life sentences without the possibility of parole. Defendant timely entered his notice of appeal.
 

 II. Standard of Review
 

 First, Defendant contends the trial court erred in sustaining the State's
 
 Batson
 
 challenge. "The 'clear error' standard is a federal standard of review adopted by our courts for appellate review of the
 
 Batson
 
 inquiry."
 

 *291
 

 State v. James,
 

 230 N.C.App. 346
 
 , 348,
 
 750 S.E.2d 851
 
 , 854 (2013) (citing
 
 State v. Cofield,
 

 129 N.C.App. 268
 
 , 275 n. 1,
 
 498 S.E.2d 823
 
 , 829 n. 1 (1998) ). "Since the trial judge's findings ... largely will turn on evaluation of credibility a reviewing court ordinarily should give those findings great deference."
 
 James,
 

 230 N.C.App. at 348
 
 ,
 
 750 S.E.2d at 854
 
 (citations omitted). "The trial court's ultimate
 
 Batson
 
 decision will be upheld unless the appellate court is convinced that the trial court's determination is clearly erroneous."
 

 Id.
 

 (citation omitted).
 

 Second, Defendant argues he timely objected to the State's closing argument, and the trial court abused its discretion in overruling his objection. This Court is "mindful of the reluctance of counsel to interrupt his adversary and object during the course of closing argument for fear of incurring jury disfavor."
 
 See
 

 State v. Jones,
 

 355 N.C. 117
 
 , 129,
 
 558 S.E.2d 97
 
 , 105 (2002). However, the State twice argued Defendant had Sanders killed before Defendant objected, seemingly in opposition to the State's argument concerning Defendant's girlfriend. Therefore, Defendant failed to timely object under N.C. R.App. Pro. 10(a)(1) and we review whether the State's closing remarks "were so grossly improper that the trial court committed reversible error by failing to intervene
 
 ex mero motu.
 
 "
 

 Id.
 

 at 133
 
 ,
 
 558 S.E.2d at 107
 
 (citation omitted).
 

 Third, Defendant contends the State's closing argument slides violated Due Process by placing a burden of proof upon him. However, Defendant concedes "North Carolina law may permit jury argument that a defendant has failed to present certain evidence" and merely preserves this issue for "further federal review." Therefore, we assign no error to this argument.
 

 III. Analysis
 

 In a capital murder case the defendant and State each is afforded fourteen peremptory challenges each during jury selection. N.C. Gen.Stat. § 15A-1217(a). However, Article I, Section 26 of the Constitution of North Carolina and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution "prohibit race-based peremptory challenges during jury selection."
 
 James,
 

 230 N.C.App. at 348
 
 ,
 
 750 S.E.2d at 854
 
 (citation omitted).
 

 In
 
 Batson v. Kentucky,
 

 476 U.S. 79
 
 ,
 
 106 S.Ct. 1712
 
 ,
 
 90 L.Ed.2d 69
 
 (1986), the United States Supreme Court set out a three-part test for
 
 Batson
 
 objections. Our Supreme Court utilized this analysis in
 
 State v. Taylor,
 

 362 N.C. 514
 
 ,
 
 669 S.E.2d 239
 
 (2008), and set out the following test:
 

 First, the defendant must make a prima facie showing that the state exercised a race-based peremptory challenge. If
 
 *292
 
 the defendant makes the requisite showing, the burden shifts to the state to offer a facially valid, race-neutral explanation for the peremptory challenge. Finally, the trial court must decide whether the defendant has proved purposeful discrimination.
 

 Id.
 
 at 527,
 
 669 S.E.2d at 254
 
 (citations omitted). While the above test is written in the context of a defendant raising a
 
 Batson
 
 objection to the State's use of peremptory challenges, our Court has made clear that the State may also raise a
 
 Batson
 
 challenge to a defendant's use of peremptory challenges,
 
 *536
 
 sometimes referred to as a "reverse
 
 Batson
 
 " objection.
 
 See
 

 Cofield,
 

 129 N.C.App. 268
 
 ,
 
 498 S.E.2d 823
 
 . In the case
 
 sub judice,
 
 Defendant only challenges the third prong of the
 
 Batson
 
 test and contends the trial court clearly erred in finding the State proved Defendant engaged in purposeful discrimination by peremptorily striking Juror 10.
 

 To determine whether the State proved Defendant engaged in purposeful discrimination, "the trial court should consider the totality of the circumstances, including counsel's credibility, and the context of the information elicited."
 
 Id.
 
 at 279,
 
 498 S.E.2d at
 
 831 (citing
 
 State v. Barnes,
 

 345 N.C. 184
 
 , 212,
 
 481 S.E.2d 44
 
 , 59 (1997) ;
 
 State v. Thomas,
 

 329 N.C. 423
 
 , 432,
 
 407 S.E.2d 141
 
 , 148 (1991),
 
 cert. denied,
 

 522 U.S. 824
 
 ,
 
 118 S.Ct. 84
 
 ,
 
 139 L.Ed.2d 41
 
 (1997) ). It is relevant, but not dispositive, to consider whether a party's use of peremptory challenges creates a "disproportionate impact on prospective jurors of a particular race."
 

 Id.
 

 (citing
 
 State v. Hernandez,
 

 500 U.S. 352
 
 , 363,
 
 111 S.Ct. 1859
 
 ,
 
 114 L.Ed.2d 395
 
 (1991) ).
 

 Our Supreme Court has utilized the following factors to determine if a party is engaging in purposeful discrimination:
 

 (1) the susceptibility of the particular case to racial discrimination; (2) whether similarly situated [blacks]
 
 [3]
 
 were accepted as jurors; (3) whether the [party at issue] used all of its peremptory challenges; (4) the race of the witnesses in the case; (5) whether the early pattern of strikes indicated a discriminatory intent; and (6) the ultimate racial makeup of the jury. In addition, [a]n examination of the actual explanations given by the [party at issue] for
 
 *293
 
 challenging [white]
 
 [4]
 
 veniremen is a crucial part of testing [the State's]
 
 Batson
 
 claim. It is satisfactory if these explanations have as their basis a "legitimate hunch" or "past experience" in the selection of juries.
 

 James,
 

 230 N.C.App. at 351
 
 ,
 
 750 S.E.2d at
 
 856 (citing
 
 State v. Robinson,
 

 336 N.C. 78
 
 , 93-94,
 
 443 S.E.2d 306
 
 , 312-13 (1994),
 
 cert. denied,
 

 513 U.S. 1089
 
 ,
 
 115 S.Ct. 750
 
 ,
 
 130 L.Ed.2d 650
 
 (1995) ).
 

 Here, Defendant and the three murder victims are black. Defendant attempted to strike Juror 10, a white male. Defendant did not strike Juror 8, a black female. Juror 8 and Juror 10 rated themselves a "four" when asked to rate their predisposition favoring the death penalty on a scale of one to seven. However, this "state of circumstances in itself does not necessarily lead to a conclusion that the reasons given by defense counsel were pretextual."
 
 Cofield,
 

 129 N.C.App. 268
 
 , 279,
 
 498 S.E.2d 823
 
 , 831 (citations omitted).
 

 We take note of Defendant's pretrial motion to prevent the State from exercising peremptory strikes against prospective black jurors. A copy of the motion does not appear in the record, but the trial court's findings clearly illustrate that Defendant sought to prevent the State from striking any black jurors, or in the alternative, inhibit the State from striking black jurors without stating a race-neutral reason for the strike. This motion was not made in response to any discriminatory action of record, and it was made in a case that is not inherently susceptible to racial discrimination. Further, the trial court's detailed findings explain Defendant exercised eleven total peremptory challenges, ten of which he used against white and Hispanic jurors. The only black juror Defendant challenged was a probation officer. Defendant's acceptance rate of black jurors was 83%, which is notably higher than his 23% acceptance rate for white and Hispanic jurors. Once the State raised its
 
 Batson
 
 challenge, defense counsel stated they struck Juror 10 because "he stated that the punishment should fit the crime ... [and] he was in favor of capital punishment as a matter of disposition." Yet this fails to resolve Juror 10's statement that being in the jury
 
 *537
 
 box made him "stop and think" about the death penalty, that he did not have strong feelings for or against the death penalty, and he considered the need for facts to support a sentence.
 
 *294
 
 Defendant contends the trial court clearly erred by considering its past experience as a capital defender. We disagree. The trial court's experience bolsters its ability to discern matters like this. After reviewing the record, it is clear the trial court properly considered the totality of the circumstances, the credibility of defense counsel, and the context of the peremptory strike against Juror 10, including Defendant's pretrial motion.
 
 Cofield,
 

 129 N.C.App. at 279
 
 ,
 
 498 S.E.2d at 831
 
 (citations omitted). Therefore, in light of the record, we cannot hold the trial court committed clear error in sustaining the State's
 
 Batson
 
 objection.
 

 Next, Defendant contends the State's closing argument was grossly improper. To conduct this analysis we must determine whether the State's argument "strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made."
 
 Jones,
 

 355 N.C. at 133
 
 ,
 
 558 S.E.2d at 107
 
 .
 

 Trial counsel is afforded wide latitude in closing argument and "may argue all of the evidence which has been presented as well as reasonable inferences" arising from the evidence.
 
 State v. Call,
 

 353 N.C. 400
 
 , 417,
 
 545 S.E.2d 190
 
 , 202 (2001) (citations omitted). In a capital murder case, the prosecutor "has a duty to strenuously pursue the goal of persuading the jury that the facts of the particular case at hand warrant imposition of the death penalty."
 

 Id.
 

 (citation omitted).
 

 The State introduced the testimony of witnesses who met Defendant in jail. They both testified Defendant told them he had a witness killed, the only witness that could put him in Charlotte at the time of the murder. Based on their testimony, the record evidence, and the timing of Sanders's death, it is fair to infer Defendant told the witnesses about Sanders, even if not by name. Moreover, the trial court took judicial notice and informed the jury that Sanders was killed 28 September 2008 in Cincinnati, and that someone other than Defendant was charged with his murder. With all of this in evidence, the State fairly inferred and argued Defendant had Sanders killed. Therefore, we hold the State's closing argument was not grossly improper. Assuming
 
 arguendo,
 
 that Defendant raised a timely objection to the State's closing, the trial court did not commit error, much less abuse its discretion, in overruling Defendant's objection since the State's argument was founded upon record evidence and inferences therefrom.
 

 *295
 
 Lastly, Defendant preserves his third argument concerning the State's use of closing argument slides for "further federal review." Therefore, we assign no error to this contention.
 

 IV. Conclusion
 

 For the foregoing reasons we hold the trial court did not commit error.
 

 NO ERROR.
 

 Judges STEPHENS and INMAN concur.
 

 [1]
 

 We note this filing is cited in the trial court's written order filed 18 February 2014. The trial court's order does not mention a specific filing date for the motion, and a copy of the motion does not appear in the record on appeal.
 

 [2]
 

 We note the State's evidence tended to show Kevin Young and Kinshasa Wagstaff kept a white Toyota Camry outside their house. The State's theory seemed to indicate that, based on DNA evidence, Defendant drove the car away after murdering Young, Wagstaff, and Hines, and setting the house on fire.
 

 [3]
 

 The race of the jurors in this quotation has been changed to the relevant facts of the case
 
 sub judice.
 
 The
 
 Robinson
 
 Court reviewed a
 
 Batson
 
 objection alleging the State engaged in purposeful discrimination by striking black jurors and keeping white jurors.
 

 [4]
 

 The race of the jurors in this quotation has been changed to the relevant facts of the case
 
 sub judice.
 
 The
 
 Robinson
 
 Court reviewed a
 
 Batson
 
 objection alleging the State engaged in purposeful discrimination by striking black jurors and keeping white jurors.