An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 17-1157-3

Filed 2 July 2025

Catawba County, Nos. 11CRS003822-170, 11CRS003823-170, 11CRS004077-170, 11CRS004078-170, 11CRS051398-170, 11CRS051400-170, 11CRS051401-170

STATE OF NORTH CAROLINA

      v.

EVERETTE PORSHAU HEWITT

Appeal by Defendant from Judgment entered 19 May 2016 by Judge Nathaniel J. Poovey in Catawba County Superior Court. Heard in the Court of Appeals 5 June 2018, with unpublished opinion issued 19 June 2018. Remanded by Special Order of the Supreme Court on 14 August 2020 for reconsideration in light of the Supreme Court's opinion in *State v. Hobbs,* 374 N.C. 345, 841 S.E.2d 492 (2020). Heard on remand in the Court of Appeals 24 March 2021. Remanded to trial court by Opinion entered 20 April 2021. Trial court's Order following remand filed with the Court of Appeals on 8 May 2024.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Zachary K. Dunn, for the State.*
>
> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender John F. Carella, for Defendant-Appellant.*

HAMPSON, Judge.

**Factual and Procedural Background**

Everette Porshau Hewitt (Defendant) appeals from a Judgment entered upon a jury verdict finding him guilty of three counts of First-Degree Murder and one count each of Attempted First-Degree Murder, Assault with a Deadly Weapon with Intent to Kill, and First-Degree Burglary. On appeal, Defendant argues the trial court erred in overruling his *Batson* objection to the prosecutor peremptorily striking a Black juror. Defendant's appeal first appeared before this Court in 2018, and we initially found no error. *State v. Hewitt*, 260 N.C. App. 127, 814 S.E.2d 921 (2018 WL 3028932) (unpublished). Upon discretionary review, the Supreme Court of North Carolina remanded the case to this Court for consideration in light of *State v. Hobbs*, 374 N.C. 345, 841 S.E.2d 492 (2020). 375 N.C. 280, 845 S.E.2d 788 (2020). On remand we held, in light of *Hobbs*, the trial court had failed to engage in a comparative juror analysis and remanded to the trial court to conduct a *Batson* hearing consistent with *Hobbs*. 277 N.C. App. 219, 857 S.E.2d 147 (2021 WL 1541488) (unpublished). The trial court entered its Order on remand on 26 August 2022. The Clerk of Court for the Catawba County Superior Court certified the Order to this Court on 8 May 2024. We now review the Order entered by the trial court following the hearing on remand.

The Record before us tends to reflect the following:

On 15 March 2011, Wade Sigmon, Susan Blevins, Connie Miller, and Joseph

Burke were shot in a trailer in Catawba County. Three of the victims died from their injuries, and Mr. Burke survived. Defendant was arrested and indicted for three counts of First-Degree Murder and one count each of Attempted First-Degree Murder, Assault with a Deadly Weapon with Intent to Kill Inflicting Serious Injury, First-Degree Burglary, and Robbery with a Dangerous Weapon. Defendant is Black, and Mr. Sigmon, Ms. Blevins, and Ms. Miller were white. Mr. Burke is Black.

Defendant's appeal concerns the State's exercise of a peremptory challenge during jury selection to strike Corey M, a Black man. Prior to Corey M's voir dire, the State had exercised five peremptory challenges, four against white prospective jurors and one against a Black prospective juror, Frances B.[1] One Black juror, Sherry J, had been accepted, but was subsequently excused for cause due to a medical concern. Following voir dire of Corey M, the State simultaneously exercised three peremptory strikes: one against a white prospective juror, Gerald K, and two against Black prospective jurors, Corey M and Charlene S.

Defendant objected to the challenges of both Corey M and Charlene S, and the trial court held a *Batson* hearing.[2] Defendant argued the State had exercised peremptory challenges as to three of four (75%) of Black prospective jurors, and only five of twenty-two (23%) of white prospective jurors. The State argued it had

---

[1] Defendant objected under *Batson* to the strike of Frances B, and the trial court overruled the objection.

[2] Defendant does not on appeal argue the trial court erred in overruling its *Batson* objection to the State's strike of Charlene S.

challenged Corey M for race-neutral reasons: his failure to answer significant portions of the juror questionnaire, his hesitation and demeanor when asked about his stance on the death penalty, and concerns over his financial ability to sit as a juror for a lengthy trial.

The trial court held Defendant had made a prima facie case of discrimination by the State in the jury selection process but found the racially-neutral reasons advanced by the State were credible and sufficient to overcome the prima facie showing. Accordingly, the trial court denied Defendant's *Batson* motion.

Following trial, the jury found Defendant not guilty of Robbery with a Firearm and guilty of three counts of First-Degree Murder and one count each of Attempted First-Degree Murder, Assault with a Deadly Weapon with Intent to Kill Inflicting Serious Injury, and First-Degree Burglary. The trial court sentenced Defendant to three consecutive terms of life without parole, as well as consecutive terms of 238 to 295 months, 38 to 55 months, and 97 to 126 months imprisonment.

Defendant appealed, arguing the trial court had erred in overruling his *Batson* objection. We initially held the trial court had not erred, holding the State "in citing Cory M.'s hesitancy concerning the death penalty in both his written and oral responses, offered 'a facially valid, race-neutral explanation for the peremptory challenge'" and the trial court did not clearly err in determining Defendant had failed to show discrimination. 260 N.C. App. at *5, 814 S.E.2d 921 (unpublished).

Defendant petitioned the Supreme Court for review. On 14 August 2020, the

Supreme Court issued a Special Order allowing the petition for the limited purpose of remanding the case to this Court for reconsideration in light of *State v. Hobbs*, 374 N.C. 345, 841 S.E.2d 492 (2020) (*Hobbs I).* 375 NC. 280, 845 S.E.2d 788 (2020).

In light of *Hobbs*, we held the trial court erred in its analysis of the third *Batson* prong. 277 N.C. App. 219, 857 S.E.2d 147 (2021 WL 1541488) (unpublished). Under *Hobbs,* a trial court ruling on a *Batson* motion must engage in a "comparative juror analysis of the prospective juror's voir dire responses." 374 N.C. at 360, 841 S.E.2d at 503. The trial court's order did not demonstrate it had done so. Accordingly, we remanded the matter to the trial court to conduct a new *Batson* hearing. We required the trial court to "enter an order including 'specific findings of fact under the totality of *all* the circumstances at the third step of its *Batson* analysis, including, but not limited to, findings . . . disclosing how or whether a comparative juror analysis was conducted.' " 277 N.C. App. at *3 (emphasis in original) (citing *State v. Alexander*, 274 N.C. App. 31, 46, 851 S.E.2d 411, 421-22 (2020).

The trial court conducted the hearing on remand on 18 July 2022. Defendant called one witness, Dr. Ross Gosky, a statistician. Dr. Gosky testified the probability that the strike rate disparity between Black and white jurors occurred by chance was 7.2 percent. Defendant argued certain white jurors were similarly situated to Corey M, in that the reasons proffered for striking Corey M also applied to them, and the State had neither struck them nor questioned them about those characteristics. The

State proffered purportedly race-neutral explanations for the alleged disparities in questioning and strikes.

On 26 August 2022, the trial court entered an order which, among other provisions, examined the applicability of the State's proffered race-neutral reasons for striking Corey M to white jurors the State had not struck. It concluded the racially neutral reasons offered by the State were not pretextual, and that based on the totality of the evidence Defendant had failed to prove purposeful discrimination. Accordingly, it overruled Defendant's *Batson* objection. The Clerk of the Catawba County Superior Court transmitted the Order to this Court on 8 May 2024.

## Issue

The sole issue on appeal is whether the trial court clearly erred in holding Defendant had failed to show purposeful discrimination and overruling Defendant's *Batson* objection.

## Analysis

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution "guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, or on the false assumption that members of his race as a group are not qualified to serve as jurors." *Batson v. Kentucky*, 476 U.S. 79, 79, 90 L.Ed.2d 69 (1986). "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Foster v. Chatman*, 578 U.S. 488, 499, 197 L.Ed.2d 1 (2016). Article I, Section 26 of the North

Carolina Constitution likewise prohibits the State from using peremptory challenges for racially discriminatory reasons. *State v. Augustine*, 359 N.C. 709, 715, 616 S.E.2d 515, 521 (2005).

When a defendant claims the State has exercised its peremptory challenges in a racially discriminatory manner, the United States Supreme Court has set out a three-part test for determining whether the State impermissibly excluded a juror on the basis of race. *Batson,* 476 U.S. at 96-98; *Snyder v. Louisiana*, 552 U.S. 472, 476-77, 170 L.Ed.2d 175 (2008). Our Supreme Court subsequently adopted the same test:

> First, the defendant must make a prima facie showing that the state exercised a race-based peremptory challenge. If the defendant makes the requisite showing, the burden shifts to the state to offer a facially valid, race-neutral explanation for the peremptory challenge. Finally, the trial court must decide whether the defendant has proved purposeful discrimination.

*State v. Taylor*, 362 N.C. 514, 527, 669 S.E.2d 239, 254 (2008) (citations omitted).

By noting the statistical discrepancy between the State's exercise of peremptory challenges against white and Black prospective jurors, Defendant produced evidence "sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California,* 545 U.S. 162, 170, 162 L.Ed.2d 129 (2005). Accordingly, the trial court correctly held Defendant established a prima facie case of discrimination. The State in turn offered facially race-neutral explanations for striking Corey M: his failure to answer significant portions of the juror questionnaire, his hesitation and demeanor when asked about his stance on the

death penalty, and concerns over his financial ability to sit as a juror for a lengthy trial. We therefore address only *Batson's* third step and determine if the trial court erred in determining whether Defendant has shown purposeful discrimination.

The trial court held the racially neutral reasons offered by the State were not pretextual and Defendant had not shown any discrimination took place during jury selection. In reviewing a trial court's *Batson* analysis, "a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder,* 552 U.S. at 477. We review the trial court's findings of fact and conduct "an independent examination of the record and will uphold the trial court's conclusions unless this Court, upon reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been committed." *State v. Hobbs*, 384 NC 144, 147, 884 S.E.2d 639, 642-43 (2023) (*Hobbs II*) (citations and quotations omitted). "[A]ll of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder,* 552 U.S. at 478. When the evidence supports multiple possible interpretations we defer to the trial court's ruling, as "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *State v. King*, 353 N.C. 457, 470, 546 S.E.2d 575, 587.

In weighing the evidence of purposeful discrimination against the proffered race-neutral reasons for the strike, our Supreme Court has directed:

> At the third step, the trial court must determine whether
> the prosecutor's proffered reasons are the actual reasons,
> or whether the proffered reasons are pretextual and the

prosecutor instead exercised peremptory strikes on the basis of race. The ultimate inquiry is whether the State was motivated in substantial part by discriminatory intent.

*Hobbs I* at 353, 841 S.E.2d at 499 (citations omitted).

In determining if the State was motivated in substantial part by discriminatory intent, the trial court must show its work and "explain how it weighed the totality of the circumstances surrounding the prosecution's use of peremptory challenges[.]" *Id.* at 358, 841 S.E.2d at 502. This stems from the requirement for "a court to consider all of the evidence before it when determining whether to sustain or overrule a *Batson* challenge." *Id.* "[A]n appellate court must remand when the trial court failed to include on the scale all the arguments presented to it by the parties." *State v. Cuthbertson*, 288 N.C. App. 388, 399, 886 S.E.2d 882, 891 (2023).

In the original Order entered on 7 April 2016, the trial court addresses Defendant's prima facie showing of purposeful discrimination and lists the State's race-neutral reasons proffered in response. It concludes by stating a blanket finding:

> The court finds the prosecutor to be credible in stating the racially neutral reasons for the exercise of the peremptory challenges as to [Corey M]. In response to such reasons stated by the prosecutor, Mr. McGinnis, defense counsel has not shown that the prosecutor's explanations are pretextual. Based upon consideration of presentations by both sides and taking into account various arguments presented, Defendant has not proven purposeful discrimination in the jury selection process in this case.

As in *Hobbs I,* the trial court failed to make specific findings regarding unchallenged white jurors who gave answers Defendant argues made them comparable to Corey

STATE V. HEWITT

*Opinion of the Court*

M. 374 N.C. at 358, 841 S.E.2d at 502. Accordingly, as we held in our previous decision in this case, the trial court in its original Order erred by "failing to engage in a comparative juror analysis of the prospective juror's voir dire responses." 277 N.C. App. 219, *3 (citations omitted). Therefore, "we [could] not know from the trial court's ruling how or whether these juror comparisons were evaluated." *Id.*

In its Order following remand, the trial court engages in this required analysis as to each comparison raised by Defendant. It addresses Corey M's failure to answer the juror questionnaire as compared to other prospective jurors, his answers to questions regarding the death penalty as compared to answers given by other jurors, his hesitation in giving these answers, and his financial status as compared to other unemployed jurors whom the State did not challenge. As the trial court in its Order following remand "adequately accounted for all the factors presented to it at *Batson's* third step," we "proceed to review Defendant's argument about whether the trial court erred in ruling against him[.]" *Cuthbertson*, 288 N.C. App. at 402, 886 S.E.2d at 892.

Trial courts use the following open-ended list of factors to determine whether the defendant has met the burden of proving purposeful discrimination:

> Statistical evidence about the prosecutor's use of peremptory strikes against Black prospective jurors as compared to white prospective jurors in the case;
>
> Evidence of a prosecutor's disparate questioning and investigation of Black and white prospective jurors who were not struck in the case

Side-by-side comparisons of Black prospective jurors who were struck and white prospective jurors who were not struck in the case

A prosecutor's misrepresentation of the record when defending the strikes during the *Batson* hearing

The susceptibility of the case to racial discrimination

Relevant history of the State's peremptory strikes in past cases; or

Other relevant circumstances that bear upon the issue of racial discrimination.

*Cuthbertson* at 403, 886 S.E.2d at 893.

We review the relevant factors from this open-ended list to determine if "all of the relevant facts and circumstances taken together establish that the trial court committed clear error in concluding that the State's peremptory strike of one Black prospective juror was not motivated in substantial part by discriminatory intent." *State v. Clegg,* 380 N.C. 127, 144, 867 S.E.2d 885, 900 (2022) (citation omitted). We address the factors relevant in this case: statistical evidence of the State's use of peremptory strikes, the susceptibility of the case to racial discrimination, and the prosecutor's stated reasons for striking Corey M. Analysis of these proffered reasons includes comparisons of the struck juror to white jurors who were not struck, any misrepresentations of the record by the prosecutor when stating these reasons, and any allegations of disparate questioning of jurors as to those reasons.

I.  Statistical Evidence of Strike and Acceptance Rates

We first consider "statistical evidence about the prosecutor's use of peremptory

strikes against Black prospective jurors as compared to white prospective jurors in the case." *State v. Bennett*, 282 N.C. App. 585, 608, 871 S.E.2d 831, 848-49 (2022). "It is relevant, but not dispositive, to consider whether a party's use of peremptory challenges creates a disproportionate impact on prospective jurors of a particular race." *State v. Hurd*, 246 N.C. App. 281, 292, 784 S.E.2d 528, 536 (2016) (citation omitted).

At the remand hearing, Defendant introduced statistical evidence presented by an expert witness, Dr. Ross Gosky. At the time of Defendant's objection, the State had exercised peremptory challenges as to five of twenty-two white jurors (22.7%) and three of four Black jurors (75%). Dr. Gosky testified the probability of the strike rate disparity in this case occurring by chance was 7.2%. Additionally, at the time Defendant objected to the State's challenge of Corey M the only Black juror accepted by the State had been subsequently excused for cause.

While this statistical difference is not as stark as that in, for example, *Cuthbertson*, in which the State struck 2 of 3 Black jurors and none of the 21 white jurors, the State's decision to strike 75% of Black prospective jurors as compared to only 22.7% of white prospective jurors likewise "favors a finding of purposeful discrimination." *Cuthbertson* at 404, 886 S.E.2d at 893-94. *See also Flowers v. Mississippi*, 588 U.S. 284, 307, 204 L.Ed.2d 638 (2019) ("In light of all of the circumstances here, the State's decision to strike five of the six black prospective jurors is further evidence suggesting that the State was motivated in substantial part

by discriminatory intent."); *Clegg,* 380 N.C. at 151-52, 867 S.E.2d at 904 (holding State's exercise of four peremptory challenges striking 10% of eligible white jurors and 66% of eligible jurors of color evidence of discriminatory intent). In concluding this, we note as well the Supreme Court of the United States has "skeptically viewed the State's decision to accept one Black juror" while striking others. *Flowers*, 588 U.S. at 307, citing *Miller-El v. Dretke*, 545 U.S. 231, 250, 162 L.Ed.2d 196 (2005).

Defendant also introduced evidence of historical strike rates, showing North Carolina prosecutors at large were historically more likely to strike Black jurors than similarly-situated white jurors. This type of historical statistical information "is included among the many types of evidence that a defendant may present, and a court may consider, within a *Batson* challenge." *Clegg* at 156, 867 S.E.2d at 907. *See also State v. Bennett*, 282 N.C. App. 585, 609, 871 S.E.2d 831, 849 (2022) (including "relevant history of the State's peremptory strikes in past cases" as a factor to be considered in the third *Batson* step).

The statistical evidence, both of the strikes used in this case and of their historical use, favors a finding of purposeful discrimination. However, "bare statistics" do not carry as much weight as other factors, particularly given how a small sample size can skew strike and acceptance rate data. *Cuthbertson* at 404-05, 886 S.E.2d at 893 (citing *Miller-El,* 545 U.S. at 241). Accordingly, evaluation of the statistical evidence is only one factor examined in our inquiry.

II.    Susceptibility to Racial Discrimination

We next consider the "susceptibility of the particular case to racial discrimination." *Bennett,* 282 N.C. App. at 621, 871 S.E.23d at 856 (citation omitted). "The race of the defendant, the victims, and the key witnesses bears upon this determination." *Id.* We focus on "whether the case crosses racial lines among those key figures." *Id.* Defendant is Black. Three of the four victims were white, and one was Black. A case may be particularly susceptible to racial discrimination when the defendant's race differs from that of the victims. *See, e.g., State v. Golphin*, 352 N.C. 364, 432, 533 S.E.2d 168, 214 (noting "this case may be one susceptible to racial discrimination because the defendants are African-Americans and the victims were Caucasian."); *State v. Hurd,* 246 N.C. App. 281, 293, 784 S.E.2d 528, 536 (2016) (holding case not inherently susceptible to racial discrimination when Defendant and all victims were black).

Although the State argues this case was not particularly susceptible to racial discrimination because race played no part in the crime, one of the victims was Black, and the key witnesses were Black, the racial divide between Defendant and the three victims killed requires we conclude this case has some susceptibility to racial discrimination. *See Bennett* at 856, 871 S.E.2d at 622 ("[A] case is particularly susceptible to racial discrimination if the identities of the defendant, victims, and witnesses cross racial lines.") Accordingly, this factor favors a finding of purposeful discrimination. *Cuthbertson* at 406, 886 S.E.2d at 895.

III.    Proffered Reasons for Striking Prospective Jurors

We next evaluate the specific reasons given by the State for exercising the peremptory challenge. Examining these justifications for pretext incorporates multiple of the above-listed factors, including any misrepresentations of the record made by the prosecutor when defending the strikes and side-by-side comparisons between the Black juror who was struck and white jurors who were not struck. *Cuthbertson* at 407, 886 S.E.2d at 895. We also address specific instances of alleged disparate questioning: Defendant does not argue the prosecutor generally asked different questions of Black and white prospective jurors or failed to examine them in the same "manner or style." *Id.* However, if the State investigates a specific issue differently depending on the race of the prospective juror, that may indicate racial discrimination as "disparate questioning and investigation of prospective jurors on the basis of race can arm a prosecutor with seemingly race-neutral reasons to strike the prospective jurors of a particular race." *Flowers,* 588 U.S. at 310.

The State offered the following race-neutral reasons for striking Corey M, as recited by the trial court in its original order:

> (a) Mr. McGinnis set forth that Mr. M failed to answer a significant number of questions on the questionnaire, specifically questions 26 through 34, 36, 40 through 50, 53, 55, 56(b) and 57 through 60.

> (b) Mr. M made comments that the "hoped we got it right," and he hoped that we could "get the right person," the insinuation being that Mr. M. had already formed an opinion about the evidence in the case, or the lack thereof.

(c) Mr. M. hesitated several times upon being asked questions from Mr. McGinnis and expressed some hesitancy in answering questions.

(d) Mr. McGinnis expressed concern about Mr. M.'s demeanor changing in court when talking about the death penalty and capital punishment.

(e) Mr. McGinnis expressed concern about Mr. M.'s statement that he would not have any problem being on the jury for a three-month period, notwithstanding that he would receive no income from his employer.

(f) Mr. M. is single.

We evaluate each of these reasons in turn.

A. *Failure to complete jury questionnaire*

During the *Batson* hearing, the State told the trial court:

Your Honor, [Corey M] failed to answer significant parts of this questionnaire. I mean, if he's – you know, the court told each and everyone of them to do this completely and honestly and as full as you can. And if [Corey M] is going to elect not to answer half of the questionnaires when he's given that opportunity, I'm not sure where he stands on anything.

In all, the State identified Corey M had failed to answer questions 25 through 34, 36, 40 through 50, 53, 55, 56(b), and 57 through 60.

Of the questions Corey M declined to answer, question 25 was a follow-up question that was irrelevant to him given his previous answer. Questions 26 through 35 concerned his marital status, family and religion. Question 36 asked "What are your hobbies?" Questions 40 through 46 asked about his relationships with members of law enforcement, court officials, and attorneys, including the trial attorneys in this

case. Questions 47 through 50 asked about his experience as a victim of crime or involvement with serious violence. Questions 53 and 55 asked if he or anyone close to him had been arrested, and what the charges were. Question 56(b) asked if he knew any of the victims in the case, and Question 60 asked if he recognized any of the potential witnesses. Questions 57 through 59 concerned his beliefs related to the death penalty.

Defendant argues several of the questions Corey M failed to answer logically did not apply to him and were likewise left blank by similarly-situated white prospective jurors whom the State did not challenge. Such similarities between struck and non-struck jurors with regards to the proffered strike justifications can indicate those justifications are pretextual. Side-by-side comparisons of Black panelists who are struck to nonblack panelists who are not can be more powerful evidence of racial motivation than "bare statistics." *Miller-El*, 545 U.S. at 241. "If a prosecutor's proffered reason for striking a Black panelist applies just as well to an otherwise similar nonblack person who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Id.*

Clarifying questions about prospective jurors' spouses and children, for example, did not apply to Corey M, and single white jurors also left some or all of those questions blank. However, he also skipped numerous questions that did apply to him, including questions 40 through 50, which were all "yes or no" questions concerning his experience with violence and his relationships with law enforcement,

court officials, and attorneys involved in Defendant's case. Corey M was the only prospective juror who declined to answer any of these questions. Defendant identifies other jurors who failed to respond to certain portions of the questionnaire, but none of those accepted by the State failed to answer as many questions as Corey M, who in total left approximately 40 questions and sub-questions blank. Corey M was also the only prospective juror who failed to answer any of the three questions related to his position on the death penalty.

Corey M's failure to respond to a significant portion of the juror questionnaire is a race-neutral justification for excusing him, both because it created an obstacle to effective voir dire and because it showed a lack of care regarding the proceedings which jurors accepted by the State did not share. *See, e.g., State v. Caporasso,* 128 N.C. App. 236, 244, 495 S.E.2d 157, 162 (1998) (holding "general lack of attention" valid reason to exercise peremptory challenge); *State v. Carter*, 338 N.C. 569, 587, 451 S.E.2d 157, 166 (1994) (holding prosecutor's preference for jurors "who did not have difficulty with instructions" race-neutral and not pretextual). As the State did not accept any nonblack jurors who failed to answer a similar selection of questions on the questionnaire, Defendant has not shown this reason to be pretextual and the trial court did not clearly err in finding this reason credible.

## B. *Position on capital punishment*

The next three reasons proffered by the State and identified by the trial court as race-neutral explanations for the strike—Corey M's comments that he "hopes we

got it right," his hesitation in answering questions, and his change in demeanor during voir dire—relate to Corey M's beliefs related to capital punishment. During the *Batson* hearing, the prosecutor stated:

> He indicated that in questioning by me about the death penalty that he says he hopes they got it right. He said— He said, "There's hope that we can get the right person." He had hesitation on whether—He had hesitation at some point during the responses to the questions. He said, "I hope we can prove that" in response to the death penalty question.

> Your Honor, it also appeared to me that his whole demeanor just changed here in court when I started talking to him about the death penalty and capital punishment.

As an initial matter, we note the trial court in its original order summarized the State's proffered reason as:

> Mr. M made comments that he "hoped we got it right," and he hoped that we could "get the right person," the insinuation being that Mr. M had already formed an opinion about the evidence in the case, or the lack thereof.

However, the State during the *Batson* hearing proffered Corey M's statements in support of its concern over his views on the death penalty. It never identified concern over whether he had already formed an opinion as to evidence or of the case. The duty of the trial court and reviewing courts is to assess the plausibility of the justifications *actually presented* by the prosecutor in support of the peremptory strike—it is not an "exercise in thinking up any rational basis" for excusing the juror. *Miller-El*, 545 U.S. at 252. "[W]hen illegitimate grounds like race are in issue, a

prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." *Id.* Because the prosecutor did not state he had challenged Corey M based on the possibility he had already formed an opinion about the case, this is not a race-neutral justification that can support the exercise of the peremptory strike.

The trial court addressed this issue in its order following remand, admitting that it "perhaps should have left the 'insinuation' comment out." However, the trial court's order continues to justify the inclusion of that language, describing Corey M's answers to the prosecutor's questions as "objectively shocking"[3] and concluding: "The Court's 'insinuation' comment was also well within the bounds of the Court's role in hearing the arguments made by counsel and making findings based thereon." To be clear: the State did not during the *Batson* hearing raise concerns over Corey M having already formed an opinion on the case. Therefore, these concerns, whether held by the trial court or held by the prosecutor and left unsaid, cannot support overruling Defendant's objection.

Although the State did not proffer concern over Corey M having already formed an opinion on the evidence, it did make clear the strike was based in part on concerns over his position on the death penalty. When relevant to the case, a prospective juror's stance on capital punishment can be a valid reason for the State to exercise a

---

[3] These answers are reproduced *infra* in this subsection.

peremptory challenge. A prospective juror may be excused if his views on the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v Witt,* 469 U.S. 412, 424, 83 L.Ed.2d 841 (1985); *see also State v Robinson,* 336 NC 78, 103, 443 S.E.2d 306, 317-18 (1994).

These concerns stemmed from Corey M's questionnaire and his answers to questions during voir dire. The jury questionnaire asked three questions concerning capital punishment:

57. Prior to coming to court today, have you formed any belief or position regarding capital punishment in general? If so, briefly dscribe that position. (What do you think about the death penalty?)

58. Are you affiliated with any religion or group that takes a position regarding the death penalty? If so, please describe briefly.

59. Is there any reason you do not feel that you could serve on a jury in a case where the death penalty may be considered? If so, please describe briefly.

Corey M declined to answer any of these questions. During voir dire, when ultimately asked if he, as a member of the jury, could recommend the death penalty if the defendant were found guilty and sufficient aggravating circumstances were shown, he answered "yes." However, the prosecutor raised concerns stemming from his responses to earlier questions regarding his stance on the death penalty:

The State: Okay. Now, prior, to coming in here last week for jury service, in your life had you had an

- 21 -

|            | opportunity to think about capital punishment or the death penalty? |
|------------|---------------------------------------------------------------------|
| Corey M:   | No.                                                                 |
| The State: | I take it you've never formed a position on that; is that right?    |
| Corey M:   | No.                                                                 |
| The State: | Or not?                                                             |
| Corey M:   | Never.                                                              |
| The State: | Okay. You've lived in the area basically your entire life; is that correct? |
| Corey M:   | Yeah                                                                |
| The State: | Do you have a position on capital punishment now, Mr. Mason, five days later? |
| Corey M:   | No.                                                                 |
| The State: | What do you think about capital punishment after being here Wednesday, Thursday, and Friday, you know, Monday morning, today? |
| Corey M:   | It's a –                                                            |
| The State: | What do you personally think about it?                              |
| Cory M:    | It's a tough decision on somebody's life. It is. To judge somebody, it's a tough decision. It's something new, so . . . . And it's hard to make a decision. It's going to take a long time to examine it and – |
| The State: | Sure. I don't think there's anyone in this courtroom that would disagree with anything you just said. |
| Corey M:   | Yeah. It's hard. You have to take your time                         |

and examine it.

The State: Okay. Mr. M, let me ask you this: You know the defendant is charged with these murders, okay? The defendant is charged with three counts of first degree murder. We've also charged him with attempted murder, charged him with felonious assault. We've charged him with robbery with a dangerous weapon. And we've charged him with burglary. Do you understand the nature of the charges?

Corey M: (Affirmative nod.)

The State: Does the nature of the charges in this case present a concern for you as we're speaking this afternoon, the fact that this is a triple homicide case?

Corey M: There's hope that everything is right, that we got the right man or the right woman – it could be a woman – you know, who murdered these people. Make sure we get the right one. Because if we get the wrong person, it's terrible.

The State: Yes, sir.

Corey M: I hear that some of them in jail and they're innocent. They got the wrong person, like that. Spent 30 years – I heard 30 years in jail and he was innocent. And finally the other person admits that he was guilty and got the wrong person. Make sure you get the right person.

The State argues Corey M's "initial failure to take a coherent position, his doubts the State got the right person, and his hesitations and demeanor change, gave ample reason supporting the challenge." As noted above, any concern over Corey M's

preexisting doubt related to the evidence may not be considered as the State failed to proffer those concerns as a reason for the strike. However, his apparent lack of opinion regarding the death penalty, either prior to voir dire while filling out the questionnaire or after several days of observing proceedings, is a legitimate race-neutral concern raised by the State.

Defendant argues Corey M's responses to these questions were similar to those given by a white juror, Matthew P, whom the State did not challenge. The plausibility of a justification given for striking a Black juror "is severely undercut by the prosecution's failure to object to other panel members who expressed views much like [his]." *Miller-El*, 545 U.S. at 248. In his questionnaire, Matthew P expressed "mixed feelings" about the death penalty, stating it "can be used to achieve justice, but has been used to kill people who turned out to be innocent." Unlike Corey M, however, Matthew P during voir dire expressed a clearer position on capital punishment. He explained that after being in the courtroom and seeing voir dire he "became more comfortable with how that is in the state of North Carolina."

Corey M at no point similarly expressed his position, and his answers to questions regarding the death penalty focused on how difficult the decision would be. Where Matthew P stated his position had clarified from observing five days of voir dire, Corey M after the same amount of time stated it was "something new" he would have to "take a long time to examine." Both Corey M's non-responsiveness on the questionnaire and his lengthy, indecisive answers on the topic during voir dire

suggest hesitation. While he ultimately answered that he could discharge his duty as a juror and recommend the death penalty if appropriate, his earlier answers show a lack of confidence in this position. Likewise, Donna R and Shelly S, two other white jurors whose answers Defendant compares to Corey M's, stated they had formerly held positions opposing the death penalty but clarified their positions had changed. Shirley S, when asked if she was "strong enough" to participate in a procedure resulting in the death penalty said "I suppose I am. I wish I could say a strong yes or a strong no, but I'm being as honest as I know to be." Unlike Corey M, she was consistent in answering questions about whether she could vote for the death penalty with an affirmative response. Each of these jurors, though perhaps not unequivocally in support of the policy of capital punishment, were able to elucidate their positions on it and consistently answered during voir dire that they could participate in a decision resulting in the death penalty. Accordingly, the trial court found:

> Each of the jurors Defendant points to were more engaged and thoughtful in their responses than Mr. M[]. Each of them seemed to understand the questions and gave answers which were responsive, unlike Mr. M[]. Each of them was able to clearly articulate their position on capital punishment, both before they came for jury service and since they had sat in the courtroom during the trial.

These jurors were distinguishable from Corey M, who struggled to communicate his position on the death penalty. The State is not required to accept a juror who has not formed a clear, coherent position at the time he is examined. *State v. Waring*, 364 N.C. 443, 487-88, 701 S.E.2d 615, 643 (2010) (affirming denial of *Batson* challenge to

strike of juror who stated she could follow the requirements of the law but held no position on death penalty prior to trial or after being instructed to consider the issue).

Defendant claims Corey M was "unequivocally in support of capital punishment" and "never wavered on his ability to impose the death penalty" because of his belief that a defendant's mental state should impact the sentence they receive. Corey M stated:

> I think, like, a person in their mind wants to kill somebody, wants to get them out of their way, I think that's the death penalty. But if he against this other person, the other person want to kill him too, get into that, two sides . . . if that person want to kill that person too and they get into a fight shooting or whatever and we can prove that, then if one of them is living and one of them is dead, should get life without parole, but if it's just the only person that want to try to kill somebody, attack somebody like that by himself, should get the death penalty. That's what I think.

Defendant compares this position this to that given by Larry D, who was not challenged, and stated "If something is deliberate and premeditated, yes, I think capital punishment would be a fair—that would be fair to them," but if "you get caught up in the wrong stuff, you know, I think life without parole." However, Larry D held this position consistently throughout his voir dire, answering the prosecutor's first question about capital punishment with this belief. Corey M only presented the above position after significant hesitation and conflicting responses that were unlike Larry D's.

In addition to Corey M's indecisive responses, the prosecutor noted that Corey

M hesitated in answering and that his "whole demeanor changed" when asked about capital punishment. We note that explanations based on demeanor "are particularly susceptible to the kind of abuse prohibited by *Batson*." *United States v. Diaz*, 26 F.3d 1533, 1543 (1994). But "[h]esitancy can be manifested by demeanor as well as words. The trial judge [is] in the best position to resolve this issue" because the trial court can observe the prospective juror's "facial expressions, tone of voice, reactions, and other nuances that are not subject to translation when reviewing a cold record on appeal." *State v. McClain*, 169 N.C. App. 657, 669, 610 S.E.2d 783, 791 (2005).

Defendant argues the trial court never found Corey M hesitated during questioning, and this hesitation therefore cannot support a determination that the strike was not motivated by race. "[W]hile demeanor-based reasoning can be rightly credited where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike, without such corroboration we cannot presume that the trial judge credited the prosecutor's assertion regarding the potential juror's demeanor." *State v. Clegg*, 380 N.C. 127, 155, 867 S.E.2d 885, 906 (2022) (citing *Snyder*).

The trial court in its original order did not specifically find as a fact that Corey M hesitated or that his demeanor changed. However, its recitation of the race-neutral reasons offered by the State included:

> (c) Mr. M hesitated several times upon asked questions by Mr. McGinnis and expressed some hesitancy in answering questions

- 27 -

>(d) Mr. McGinnis expressed concern about Mr. M's demeanor changing in court when talking about the death penalty and capital punishment

It then held in the order as a blanket conclusion that it "finds the prosecutor to be credible in stating the racially neutral reasons for the exercise of the peremptory challenge."

The rule in *Clegg* requiring the trial court make a finding the prosecutor credibly relied on demeanor in order that a reviewing court may affirm its decision based on that factor stems from the decision of the United States Supreme Court in *Snyder v. Lousisiana*, 552 U.S. 472, 170 L.Ed.2d 175 (2008). In that case, the prosecutor proffered two reasons for a peremptory strike, one of which was the prospective juror's demeanor. 552 U.S. at 479. The trial judge made no findings and "simply allowed the challenge without explanation." *Id.* Accordingly, there was no indication the trial court had found the juror's demeanor to be a valid reason for the strike, as it could just as easily have made its ruling based on the other proffered reason. *Id.* Likewise, in *Clegg* the trial court reviewed its *Batson* order on remand from this Court. 380 N.C. at 132, 867 S.E.2d at 892. The trial court had made no findings of fact in its original order regarding the prospective juror's body language and eye contact, and defense counsel had refuted that the juror displayed such body language or failed to make eye contact. 380 N.C. at 155, 867 S.E.2d at 906. Accordingly, our Supreme Court held the trial court was correct to reject this explanation for the strike at the rehearing. *Id.*

In this case, defense counsel did not refute the prosecutor's description of Corey M's demeanor, and the trial court found in its original order that each of the proffered reasons, including demeanor, were credible. From that order, it is clear the trial court "credited the prosecutor's assertion regarding the potential juror's demeanor." *Clegg* at 155, 867 S.E.2d at 906). Corey M's hesitation is also shown by the transcript: as the trial court observes in its order following remand, his answers on voir dire were generally limited to saying "yes" or "no" until the prosecutor began asking about his position on the death penalty, at which point he began providing lengthier explanations which did not directly answer the questions posed. Corey M's hesitation and change in demeanor when asked about the death penalty are supported by the record and the trial court's findings.

Defendant also argues the prosecutor's assertion "he indicated that in questioning by me about the death penalty that he says he hopes they got it right" was contradicted by the record, arguing Corey M's statement was made in response to questioning about the nature of the charges, rather than the death penalty. "[P]roffered reasons that are contradicted by the record are unacceptable in supporting a challenged peremptory strike." *Clegg,* 380 N.C. at 154, 867 S.E.2d at 906 (citing *Foster*, 578 U.S. at 505). It is true that the question immediately preceding this answer concerned the homicide charges Defendant faced. However, this was immediately following and in the context of the prosecutor's exchange with Corey M about the death penalty, and Corey M continued to express his concerns about the

difficulty of making the correct decision, as he had when responding to questions about the death penalty. We cannot say the prosecutor misrepresented the record when presenting this explanation to the trial court.[4]

The State in proffering Corey M's hesitation regarding the death penalty in both his written and oral responses offered a facially valid, race-neutral explanation for the peremptory challenge. Defendant has not shown this explanation to be pretextual.

## C. *Financial concerns*

The prosecutor also identified concerns regarding Corey M's financial ability to serve as a juror for a trial that could potentially last three months or more:

> Your Honor, he answered up that he – if this case goes three months, he's not going to have any issues – He's single. I know he lives in a house that his father gave him, but he said he wouldn't have any concerns about being unemployed for three months if this case goes three months. And, frankly, Your Honor, I find that a little hard to believe how someone could survive three months without any income coming in.

Defendant argues this concern was also pretext for discrimination. Corey M

---

[4] The trial court addresses this argument in its order following remand, concluding: "Considering the colloquy as set forth above, and the fast-paced nature of court proceedings generally, this Court did not require Mr. McGinnis to set forth with exact precision either the question to which Mr. M[] responded or his verbatim response. Mr. McGinnis' arguments and presentation to the Court were reasonable under the circumstances and in no way indicate a nefarious purpose or discriminatory intent." Defendant argues following remand this language shows the trial court placed an inappropriate burden on him: to show a "nefarious purpose" and that the prosecutor had a "purely racially discriminatory motive" for the strike, rather than the correct standard: that the peremptory strike was motivated in substantial part by discriminatory intent. This argument is unsupported by the trial court's order.

told the court that although his employer did not pay for jury service, he would be fine because his father had left him a house without a mortgage. Defendant argues this explanation was reasonable because housing is the largest budget item for all households. Beyond that, Defendant argues the State failed to adequately inquire into Corey M's financial situation and failed to strike similarly-situated jurors Harold L and Thomas L.

All the questions concerning Corey M's financial situation were asked by the trial court, prior to the parties conducting voir dire. After Corey M explained to the trial court his employer did not pay him for serving on a jury, but he would be financially capable of sitting for a three-month trial because he owned a house with no mortgage, the State made no inquiry about his financial situation. "The State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting the explanation is a sham and a pretext for discrimination." *Miller-El*, 545 U.S. at 246. The trial court in its order found the State's decision not to inquire further into Corey M's finances was reasonable, as the court had already questioned him "in some detail about this issue," inquiring in detail about his finances could be seen as intrusive both by Corey M and the other jurors in the room, and because Corey M "had volunteered statements which could be viewed as prejudicial toward the State and the justice system," such that it was reasonable to limit the number of questions asked.

Defendant compares Corey M to an unchallenged juror he argues was similarly

situated. Harold L, like Corey M, stated he had no individual income. However, he also stated he was "unofficially retired" and had not worked since 2010, six years before the trial. He was also married and explained his source of income was his wife's pension and their savings. It was clear from Harold L's answers that sitting for a jury trial would not impact his financial stability.

Defendant also notes that Thomas L was also single and did not state whether his employer paid for jury duty, and the State did not question him about his financial situation before accepting him. The trial court explained in its order that it inquired further into Corey M's financial situation because, unlike Thomas L, he failed to answer question 34 on the juror questionnaire: "Do you have any problem or pressing personal or business plans that might prevent you from giving your full attention to this case if you are chosen to serve as a juror?" Unlike Corey M, Thomas L at no point indicated he would be without income during the trial.

While disparate investigation can indicate a proffered explanation is pretextual, the record does not indicate the State's concerns about financial hardship were insincere. The prosecutor inquired into many white prospective jurors' financial situations during voir dire, exercising peremptory challenges as to several of them, including some who, like Corey M, stated jury duty would not cause them financial hardship. The trial court did not clearly err in finding the State's concerns about Corey M's financial situation were not pretextual.

Additionally, Defendant argues the State's identification of Corey M as single

was a pretext, as it admitted single white jurors Thomas L and Shirley S. However, despite the trial court listing Corey M's marital status in its original order as a race-neutral reason offered by the State, the transcript shows the State offered this information in the context of its concern for Corey M's ability to financially sustain jury duty over a three-month trial. The prosecutor only referred to Corey M's marital status during the *Batson* hearing when stating:

> Your Honor, he answered up that he – if this case goes three months, he's not going to have any issues – He's single. I know he lives in a house that his father gave him, but he said he wouldn't have any concerns about being unemployed for three months if this case goes three months. And, frankly, Your Honor, I find that a little hard to believe how someone could survive three months without any income coming in.

On remand, the trial court found accordingly:

> Thus, it is clear form the record in this case that Mr. McGinnis' statement "[h]e's single" was made in the context of and as part of another race neutral reason offered by the State – that Mr. M[] stated he would not have any financial issues being on a three-month trial without any income. "He's single" was Mr. McGnnis' attempt to expound upon the fact that Mr. M[] did not have any other source of household income from which he could survive for three months – not an independent reason for exercising a strike.

Corey M's marital status was not an independent reason for the peremptory strike and was therefore not pretextual.

IV.    Other factors

The list of factors to consider in our inquiry is open-ended, and we must

consider all of the circumstances that bear upon the issue of racial animosity. *Miller-El*, 545 U.S. at 239. Accordingly, we consider additional circumstances raised by Defendant.

### A. *Strike of Charlene S*

The State exercised a peremptory challenge as to Charlene S, a Black woman, simultaneously with its challenge of Corey M. Defendant objected to this challenge at trial and, although he does not appeal the trial court's ruling allowing the challenge, he argues the State gave pretextual reasons for excusing her. The prosecutor's proffer of pretextual reasons for striking one juror can be evidence that other peremptory strikes were substantially racially motivated. *See Snyder*, 552 U.S. at 478 ("[I]f there were persisting doubts as to the outcome, a court would be required to consider the strike of Ms. Scott for the bearing it might have upon the strike of Mr. Brooks."). However, the prosecutor named multiple race-neutral, non-pretextual reasons for striking Charlene S, in particular her statements that her views and feelings would "prevent or substantially impair her ability to recommend [the death penalty]" and admitting that she would not vote for death, even if that meant not following the law. The State's challenge of Charlene S does not indicate its strike of Corey M was substantially motivated by race.

### B. *Race "important in the mind of the prosecutor"*

Following jury selection, the State issued a press release regarding the case. This press release included a description of the racial composition of the jury, stating:

> The jury is made up of four men and eight women, one
> black member and 11 white members. The alternates are a
> black female and a white male.

Additionally, when Defendant moved to excuse the jury foreperson, the only Black juror, for misconduct, the trial court said "There's a lot to be said for keeping an African-American on the jury." The State asked that the record reflect the alternate was a white male and stated the alternate "told the court that he can be fair. But I think in the interest of fairness and what they're asking, that should be made clear." Defendant argues the press release and this statement indicate race was "important in the mind of the prosecutor."

In support of this contention, Defendant cites only the broad proposition that "questions and statements made by the prosecutor during voir dire examination and in exercising his peremptories . . . may either lend support to or refute an inference of discrimination." *State v. Smith*, 328 N.C. 99, 121, 400 S.E.2d 712, 724 (1991). However, an acknowledgment of the possible impact of race on the trial, particularly after a *Batson* challenge has been made, does not indicate the prosecutor's decisions were motivated by race. *See State v. Williams,* 339 N.C. 1, 18, 452 S.E.2d 245, 255 ("the mere mention of race . . . is not evidence of racial animus."). This circumstance does not tend to show the peremptory challenge was substantially motivated by race.

V.   Weighing the relevant factors

After reviewing all of the relevant facts and circumstances, we determine that, taken together, the trial court did not commit clear error in concluding the

peremptory strike of Corey M was not motivated in substantial part by discriminatory intent. *Clegg*, 380 N.C. at 144, 867 S.E.2d at 900. The statistics of strike rates and the susceptibility of the case to racial discrimination weigh in favor of a finding of discriminatory intent, but "those two factors alone are not as powerful as other factors." *Cuthbertson*, 288 N.C. App. at 414, 886 S.E.2d at 900. The prosecutor proffered three race-neutral explanations for the strike, each of which withstand our scrutiny and do not appear pretextual: (1) Corey M's failure to complete the jury questionnaire; (2) his hesitation and lack of coherent position when asked about the death penalty; and (3) concerns about his financial ability to sit for a lengthy trial.

Thus, based on the Record before us, we are not "left with the definite and firm conviction that a mistake has been committed." *Bennett*, 282 N.C. App. at 600, 871 S.E.2d at 844. Therefore, the trial court on remand did not clearly err in denying Defendant's *Batson* objection. Consequently, in turn, the trial court's Order on remand was entered consistent with our prior decision and addresses the remaining issues presented in Defendant's appeal.

## **CONCLUSION**

Accordingly, for the foregoing reasons, we conclude there was no error at trial and affirm the Judgment.

NO ERROR.

Judges TYSON and ARROWOOD concur.

Report per Rule 30(e).